FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ NOV 04 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JACQUELINE MATOS,

                        Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.
------------------------------------------------------------x

MEMORANDUM & ORDER

16-cv-1877 (ENV)

VITALIANO, D.J.

    Plaintiff Jacqueline Matos requests review, pursuant to 42 U.S.C. § 405(g), of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). The parties have cross-moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Commissioner's motion is denied, and plaintiff's cross-motion is granted to the extent that this matter is remanded for further proceedings consistent with this opinion.

## Procedural History

    On July 19, 2012, Matos filed an application for SSI, claiming she has been disabled since January 1, 2009, due to bipolar disorder, limb pain, agoraphobia, depression and abnormal urinalysis. Record ("R"), Dkt. 7, at 126-31, 171. The Social Security Administration ("SSA") denied the application on November 26, 2012, finding that plaintiff was not disabled. R. at 67-71. On September 18, 2014, Administrative Law Judge Joani Sedaca convened an administrative hearing to review the denial of benefits, at which Matos, who was and remains represented by counsel, appeared and testified. R. at 25-57. During the hearing, plaintiff



1

amended her disability onset date to April 16, 2012. R. at 12, 35-36.

In a December 10, 2014, written decision, the ALJ denied Matos's claim, concluding that she had not suffered from a "disability," within the meaning of the Act, from July 19, 2012, through the date of the decision. R. at 7-20. Matos appealed that decision administratively, but her appeal was denied by the Appeals Council. R. at 1-6. This action followed.

## Background

Matos was born on July 20, 1976, in Brooklyn. R. at 30-31, 376. She is a single mother of five. R. at 33. Matos completed the tenth grade, but she testified to reading at a fifth-grade level. R. at 34. In 2006 and 2009, she worked as a babysitter, home attendant, and daycare assistant. R. at 36-41, 133, 166. Although Matos testified that she does not remember when she last worked, her Work History Report lists no work since June 2009. R. at 36-37, 183-85. In 2010, Matos's mother passed away. R. at 41, 433, 599. Matos claims that she left work due to her mother's passing and that she is unable to work due to depression, anxiety and attention deficit disorder. R. at 31-32. Matos elaborated at the hearing that she often needs reminders to tend to basic personal hygiene, like brushing her teeth and hair. R. at 44. She lamented that she does not travel by train by herself, and explained that the last time she tried to do so, around 2012, it resulted in a panic attack. R. at 32-33, 51-52. As for household tasks, Matos testified that she shops for groceries while accompanied by her children "only if the supermarket is not packed," R. at 46, and that her children take care of the laundry and house cleaning. R. at 46-47.

### I. Medical Conditions

Matos says she continues to experience what she describes as "depression, anxiety, and ADD." R. at 31. In 2012, she complained of "feeling down," "crying a lot" and "feel[ing] like the room is closing in on her." R. at 401. She was, as a result, prescribed Zyprexa by her

2

primary care physician and was referred to the Puerto Rican Family Institute (the "institute") on or about March 22, 2012. *Id.* Matos did not receive treatment elsewhere for this condition. R. at 50. During her screening at the institute, on March 29, 2012, Matos complained of depression and panic attacks. R. at 402. She expressed to therapist Karin Gorseth that her depression began seven years earlier, after discovering that one of her children had been molested. Her condition worsened, she reported, following her mother's death in 2010. R. at 402. She described her main symptoms as "panic, nervousness, heart racing, insomnia, and hyper-vigilance." R. at 402. She was taking Xanax at the time but reported that she "can't notice a difference." R. at 408.

On July 16, 2012, Matos's SSA case manager, Alan Zebek, completed a third-party Function Report for Matos in preparation for her benefits application. R. at 157-64. Matos claimed that she had depressive thoughts and avoided leaving the house unless necessary. R. at 157. She traveled outside of her home to attend her medical and therapy appointments but otherwise avoided crowds. R. at 160. She said she does not know how to drive and prefers to travel with another person. R. at 160. Matos explained that, when feeling depressed, she would neglect her personal hygiene; she would not change her clothes, shower, wash or brush her hair for days at a time. R. at 158. Matos had difficulty sleeping because of anxiety, racing thoughts and hallucinations. R. at 158. Additionally, she also complained about difficulty concentrating, "memoriz[ing] things and events" and following instructions due to her "emotional problems." R. at 162. Matos reported that she "does not handle stress well," explaining that she cries frequently and isolates herself. R. at 163. Plaintiff says she does not socialize because of her psychiatric issues. R. at 161.

II. Medical Evaluations

The record establishes that Matos sought treatment for her various conditions at the

institute from March 29, 2012, through March 10, 2014. *See* R. at 386-600 (institute treatment notes). On April 12, 2012, Matos was evaluated by Dr. J.C. Jean-Francois, an attending psychiatrist at the institute. R. at 436. In completing a Wellness Plan Report, Dr. Jean-Francois found Matos's psychological stressors "severe" and assigned her a Global Assessment of Functioning score ("GAF score") of 50.[1] R. at 341-42. Dr. Jean-Francois diagnosed Matos with major depressive disorder and panic disorder with agoraphobia. R. at 319. He recommended continued individual therapy and prescribed her Celexa, Klonopin and Atarax. R. at 319. Dr. Jean-Francois also noted her history of trauma, depressed mood and panic attacks, although she was coherent with no delusional, suicidal or homicidal ideations. R. at 319. Further, Dr. Jean-Francois noted her severe psychological stressors, low level of daily functioning and persistent depression and anxiety. R. at 319-20. Citing a learning disability and problems with memory as limitations, Dr. Jean-Francois determined that Matos was unable to work for a period of at least 12 months. R. at 320.

On October 18, 2012, at the Commissioner's request, psychologist Sally Morcos performed a psychiatric evaluation of Matos. R. at 259-63. During the evaluation, plaintiff reported that she cries continuously, is constantly fatigued and feels body aches. R. at 259-60. She also advised that "she thinks too much and gets upset quickly." R. at 260. Additionally, Matos indicated that she experiences anxiety attacks, approximately four to five times per month, experiences shortness of breath, body shakes, and hand tingles, and that she passes out. R. at 260. Continuing, she also complained of memory difficulties, and stated that, since 2009, she "has been hearing someone calling her name." R. at 260. As for daily functioning, Matos stated

---

[1] It is commonly understood that a GAF score of 41-50 denotes serious symptoms or any serious impairment in social, occupational or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 27-34 (4th ed., text rev. 2000).

4

that she could dress, bathe and groom herself and could take public transportation unassisted. R. at 261. Her children, however, assist her with tasks, such as cooking, cleaning and shopping. R. at 261. Matos interacts, she says, with her family, but maintains that she does not have friends because "she does not trust anyone." R. at 261.

Dr. Morcos noted that Matos had a depressed affect and that her mood was dysthymic. R. at 260, 261. Despite noticing that Matos's recent and remote memory skills were impaired due to emotional distress and depression, Dr. Morcos observed that her intellectual functioning was average, her attention and concentration were intact and she exhibited fair insight and judgment. R. at 261. Dr. Morcos further noted that Matos can understand and follow simple directions and instructions, perform simple tasks independently, maintain a regular schedule and can learn new tasks and perform complex tasks with supervision. R. at 262. Even so, Dr. Morcos opined that, due to her depressive symptoms, Matos cannot make appropriate decisions, relate adequately with others or appropriately deal with stress. R. at 262. In summarizing these examination results, Dr. Morcos determined that they "appear to be consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily basis." R. at 262. Dr. Morcos diagnosed Matos with "major depressive disorder, severe, without psychotic features [and] anxiety disorder, NOS."[2] R. at 262.

On November 23, 2012, Dr. E. Gagan, a State agency medical consultant, performed a psychiatric review of Matos's medical evidence and completed a Psychiatric Review Technique ("PRT"). R. at 226-39. Dr. Gagan noted that Matos had an affective disorder and an anxiety-related disorder. R. at 229, 231. Dr. Gagan opined that she had mild limitations in activities of

---

[2] "NOS" means "not otherwise specified." *See NOS*, FREE DICTIONARY, *available at* https://medical-dictionary.thefreedictionary.com/NOS (last visited Sept. 10, 2019).

5

daily living, in maintaining social functioning and had moderate difficulty in maintaining concentration, persistence or pace. Further, she concluded that she would likely experience one or two episodes of deterioration, each of extended duration. R. at 236.

In a mental residual functional capacity assessment, Dr. Gagan opined that Matos was moderately limited in her ability to do the following tasks: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be reasonably punctual; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; and respond to changes in the work setting. R. at 246-47. Despite these findings, and although not having met or treated Matos, Dr. Gagan concluded that she would be able to understand, remember and carry out simple instructions; maintain concentration, pace and persistence; interact adequately with peers and superiors and adapt to changes in the work setting. R. at 247-48.

On November 20, 2013, Matos underwent an examination with Dr. John George, an internist with the New York City Human Resources Administration. *See* R. at 348-74 (biopsychosocial summary). Dr. George noted that Matos exhibited the following non-exertional work limitations: poor concentration, "labile" mood and poor social interaction. R. at 371. Dr. George opined that Matos was unable to work due to "persistent symptoms of depression, panic disorder and [a]gorapohbia despite treatment." R. at 374. Dr. George noted that Matos's treatment is expected to last for a period longer than 12 months. R. at 374.

III. The Administrative Hearing

At the administrative hearing on September 18, 2014, Matos appeared in person and was represented by counsel. R. at 27. She had submitted a medication list prior to the start of the

hearing, but her counsel indicated that the record may be incomplete in light of the updated treatment records received from the institute. R. at 27-28. Apart from this possible discrepancy, the record was apparently complete through April 2014. R. at 29. At the hearing, Matos testified to the effects of her depression, anxiety and attention deficit disorder. R. at 31-33, 43-53. No medical expert was present, but the ALJ heard from a vocational expert, Melissa Fass-Karlin. R. at 43, 54-56. Ms. Fass-Karlin testified that an individual with the same vocational profile as Matos, who could only perform simple, routine and repetitive tasks with only occasional work setting changes, no contact with the public and only occasional contract with co-workers, would be unable to perform her past work as a home attendant, daycare worker or child monitor. R. at 54-55. However, Fass-Karlin concluded that an individual with this profile could work as a cleaner, hand packager or kitchen helper. R. at 55-56. Fass-Karlin further noted that if such a worker were limited to unscheduled absences "due to emotional reasons" more than 20% of the time, then the worker "couldn't do any work". R. at 56.

In a written decision, dated December 10, 2014, the ALJ first found, at step one of the sequential analysis, that Matos had not engaged in substantial gainful activity since July 19, 2012. R. at 12, 20. At step two, the ALJ determined that she suffered from two severe mental impairments: depressive disorder and panic disorder. R. at 12. The ALJ also found that Matos did not have a severe physical impairment. R. at 12-13.

At step three, however, the ALJ found that the impairments or combination of impairments did not medically meet or equal the criteria of any SSA-listed impairments. R. at 13. As reflected in her decision, the ALJ considered whether Matos had limitations in the areas of: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation, if the episodes were of extended duration. R. at 13-14. The

ALJ concluded that Matos had mild restriction in activities of daily living, moderate difficulties in social functioning and concentration, persistence or pace, and no limitations with respect to episodes of decompensation. R. at 13-14. Because plaintiff's mental impairments did not cause at least two marked limitations, the ALJ determined that the "Paragraph B" criteria of the Listings were not satisfied. R. at 14. The ALJ did not find any Paragraph C criteria of note. R. at 15.

Next, at step four, the ALJ determined that Matos was unable to perform her past relevant work as a home attendant, daycare worker and child attendant. R. at 19. But the ALJ did determine that she has the residual functional capacity to perform a full range of other work at all exertional levels, with some non-exertional limitations, and could perform simple, repetitive tasks with only occasional decision-making and minimal changes in work setting. R. at 15. Acknowledging another limiting condition, though, the ALJ further noted that, in performing this work, "there must be no contact with the public and only occasional contact with co-workers including supervisors." R. at 15.

Finally, at step five, the ALJ recited her consideration of plaintiff's remaining mental capacities and her occupational base, age, education and work experience and then found that she was able to perform other work that exists in significant numbers in the national economy; specifically, as a cleaner, hand packager or kitchen helper. R. at 19-20. Of course, that meant that she found that she was not disabled. R. at 20.

In reaching her decision, the ALJ gave great weight to the State agency medical consultant, Dr. Gagan. Specifically, she credited Dr. Gagan's opinion that Matos had mild to moderate limitations and could perform simple work. The ALJ found that opinion was "consistent with the objective evidence." R. at 18. Conversely, she accorded little weight to Dr.

Morcos, who performed a consultative psychiatric evaluation, concluding it was a one-time evaluation "based mostly on claimant's statements." R. at 17. The ALJ likewise gave little weight to Dr. Jean-Francois's opinion because his report was based mainly on Matos's self-reporting. R. at 18. She also noted the lack of longitudinal treating history at the time of Dr. Jean-Francois's report. R. at 18. Lastly, the ALJ did not accord any weight to the opinion of Dr. George, side stepping primarily on the ground that the determination of a claimant's ability to work is reserved to the Commissioner. R. at 17-18.

## Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse or modify it "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004). When evaluating a determination by the Commissioner to deny a claimant disability benefits, a reviewing court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Lockwood v. Comm'r of Soc. Sec.*, 914 F.3d 87, 91 (2d Cir. 2019) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)).

Case law also cautions courts to "keep[] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). When evaluating the evidence, "[t]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal

9

quotations omitted); *see also Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) (ALJ's medical conclusion "overlooked the facts in the record and, more egregiously, constituted an improper substitution by the ALJ of her own lay opinion in place of medical testimony").

Nonetheless, if "there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

## Discussion

### I. Entitlement to Benefits

A "disability" justifying benefits exists if the claimant demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has adopted a five-step sequential evaluation for the adjudication of disability claims, set forth at 20 C.F.R. § 404.1520. The Second Circuit describes the process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly

limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). Although the claimant bears the burden of proof as to the first four steps, the burden shifts to the Commissioner at the fifth step. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

In applying the five-step evaluation process, an ALJ must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)); *see also Cammy v. Colvin*, No. 12-CV-5810 (KAM), 2015 WL 6029187, at *10 (E.D.N.Y. Oct. 15, 2015). Where the information in the record is inconsistent, the Commissioner can weigh the relevant evidence to determine whether the claimant is disabled. 20 C.F.R. § 404.1520b(b). The ALJ need not address every conflict in the record, but "the crucial factors in any determination must be set forth with

sufficient specificity to enable [the court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

II. The ALJ's Decision

The treating physician rule requires that medical opinions from the claimant's treating sources regarding the nature and severity of the impairments claimed be given controlling weight as long as such opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record.[3] 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *accord Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). However, "the opinions of a treating source need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Martes v. Comm'r of Soc. Sec.*, 344 F. Supp. 3d 750, 758 (S.D.N.Y. 2018) (citation omitted).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The nonexclusive "*Burgess*" factors to be considered are "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (citing *Selian*, 708 F.3d at 418); *see also* 20 C.F.R. § 404.1527(c)(2)-(6). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96. This error is not harmless, and the adverse decision is subject to remand if the Commissioner has not otherwise provided "good reasons" for its weight assignment. *Id.*

---

[3] The rule applies only to social security claims that, like Matos's, were filed before March 27, 2017.

12

The treating physician rule is particularly important in the context of mental health treatment because mental impairments are "difficult to diagnose without subjective, in-person examination." *Richardson v. Astrue*, No. 9-CV-1841 (SAS), 2009 WL 4793994, at *7 (S.D.N.Y. December 14, 2009). Moreover, mental health treatment is often nonlinear, as patients may experience "good days and bad days," depending on their current stressors. *See Drysdale v. Colvin*, No. 14-CV-1722 (SN), 2015 WL 3776382, at *5 (S.D.N.Y. June 16, 2015). The relationship between the patient and her treating source, therefore, can provide a more nuanced understanding of the patient's health than can a single consultative evaluation. *Id.* Indeed, the opinion of a consultative source "who examined the plaintiff once should not be accorded the same weight as the opinion of a treating psychotherapist." *Vasquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900 (JCF), 2015 WL 4562978, at *15 n.30 (S.D.N.Y. July 21, 2015). Reliance on a consultative source is "even less supportable" where the ALJ also engages in cherry-picking, accepting portions of an evaluation that support the ALJ's determination and rejecting those that call it into question. *Id.*; *see also Quinto v. Berryhill*, No. 3:17-CV-00024 (JCH), 2017 WL 6017931, at *14 (D. Conn. Dec. 1, 2017).

As made clear in her decision, the ALJ disregarded Matos's treating sources and, in all practical effect, gave controlling weight to the opinion of Dr. Gagan, the consultative psychiatrist. The record, though, is replete with contrary opinions of multiple sources, including Matos's treating physician, that describe the severe impact her depression, anxiety and agoraphobia had on her daily life, even to the point that she was unable to attend to personal hygiene. Matos's treating psychiatrist at the institute, Dr. Jean-Francois, assessed that Matos had depressive disorder and panic disorder with agoraphobia. R. at 341. He opined that Matos had severe psychological stressors and a low level of daily functioning, and that she was unable to

work for at least 12 months. R. at 319-20. But, the ALJ gave Dr. Jean-Francois's opinions little weight because (1) the Treating Physician's Wellness Plan Report was based largely on plaintiff's self-reporting; (2) the decision about ability to work is reserved to the commissioner; and (3) there was no longitudinal treating history at the time of the report. R. at 18.

To be sure, notwithstanding the opinion of any health provider on the subject, a legal determination concerning a claimant's ability to work is reserved to the Commissioner. The two additional reasons given by the ALJ, however, do not suffice to discount Dr. Jean-Francois's opinion on Matos's psychological stressors and daily functioning. First, mental impairments are difficult to diagnose without an in-person examination. *Richardson*, 2009 WL 4793994, at *7. Second, it is true that, at the time of the Wellness Report, Matos was only one month into her treatment at the institute. Yet, though the definiteness of the ALJ's determination suggests otherwise, her treatment there did not end then. She would go on to receive treatment at the institute for approximately two years (from March 2012 to March 2014).[4] The record covers treatment and contains progress notes throughout this period. R. at 401-600.

Significantly too, the weight of other medical evidence in the record corroborates the opinions of Dr. Jean-Francois. Dr. George, for instance, noted in his biopsychosocial summary that Matos had limitations in her ability to understand, remember and maintain attention. R. at 371. She exhibited, the doctor reported, poor concentration, labile mood and poor social interaction. R. at 371. He opined that Matos was unable to work due to persistent symptoms of depression, panic disorder and agoraphobia, despite one year of treatment. R. at 374. Dr. George also noted that Matos's treatment is expected to be last for a period longer than twelve

---

[4] The ALJ incorrectly noted that the treatment period was from March 2013 to February 2014. R. at 15.

14

months. R. at 374.

Likewise, at the conclusion of a mental status evaluation she performed, Dr. Morcos assessed that Matos had major depressive disorder and anxiety disorder. R. at 262. She opined that Matos could not maintain a regular schedule, make appropriate decisions, relate adequately with others or appropriately deal with stress. R. at 262. Dr. Morcos concluded that these difficulties were caused by depressive symptoms. R. at 262. The ALJ, nevertheless, gave little or no weight to the opinions of both Drs. George and Morcos. R. at 17-18. Notably, the ALJ's justification for discounting Dr. Morcos's opinion could be applied with equal force to the opinions of Dr. Gagan, which the ALJ accorded "great weight." R. at 18. That is, Dr. Gagan, like Dr. Morcos, performed a one-time evaluation – not even conducted in person. Adding insight, there was no treatment relationship between Matos and Dr. Gagan. In this setting, the record suggests that the ALJ favored Dr. Gagan's opinion because it was consistent with her own lay assessment – a choice that finds no embrace in case law. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("In analyzing a treating physician's report, the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion." (internal quotations omitted)).

Even in her one-shot examination, Dr. Gagan confirmed that Matos had major depressive disorder and panic disorder. R. at 229-31. But, though running against the grain of the evidence adduced from all of the other practitioners, she opined that she had only mild limitations in activities or daily living and maintaining social functioning. R. at 236. In assessing Matos's mental residual functional capacity, Dr. Gagan opined that she could perform activities within a schedule, maintain regular attendance, be punctual and complete a normal workday without interruptions from psychologically based symptoms. R. at 246-47. She further opined that she could interact adequately with peers and supervisors and adapt to changes in the workplace. R.

at 248. Critically, though, as noted above, the ALJ gave Dr. Gagan's opinion great weight, despite it being at odds with the opinions of Drs. Jean-Francois, Morcos and George, because, she found, her opinion was consistent with her view of the "objective evidence," such as Matos's attention, cooperation and concentration and social skills. R. at 14, 18.

In short, the ALJ plainly disregarded the treating physician rule, favoring the offering of a non-examining consultative review psychologist over the opinions of Matos's treating source, supported by other consultative examinations. This legal error – which, standing alone, requires remand – is especially glaring in light of the overwhelming weight of other record evidence. For example, the ALJ homed in on indicia of improvement in Matos's condition, yet ignored those institute treatment notes that substantiated Matos's contention that her symptoms were severe and constant. *See, e.g.*, R. at 506. In other words, the ALJ simply cherry-picked the clinical findings suggesting that Matos was "doing well" and that her condition had improved,[5] R. at 16, when, in fact, the treatment notes also contain clinical findings that Matos was severely depressed, "teary-eyed" and had "tension and anger in her body and body language." R. at 433, 461.

In sum, the ALJ committed legal error by improperly according Dr. Gagan's non-examining evaluation "great weight" and failing to give controlling weight to the opinions of Dr.

---

[5] For example, the ALJ placed emphasis on plaintiff's failure to keep therapy appointments as suggesting a lack of severity in her condition. R. at 15-16. What the ALJ disregarded were the reasons for those missed appointments, which lead in the exact opposite direction. The evidence showed that appointments were missed because Matos could not travel alone. R. at 32-33, 51-52. Indeed, on the way to one appointment, she had to abort the trip because of a severe panic attack on the subway, mandating a taxi trip home accompanied by her sister. R. at 51-52, 511. The error was reinforced when Matos's inability to travel unexpectedly was not featured in the questions posed to the vocational expert. R. at 54-57.

Jean-Francois, whose findings were in harmony with the opinions of other healthcare professionals and consistent with substantial objective record evidence. Remand of this action, therefore, is warranted.

## Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and plaintiff's cross-motion is granted to the extent that the final order of the Commissioner is vacated, the decision of the ALJ is reversed and the matter is remanded to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is directed to enter judgment accordingly and to close this case for administrative purposes.

So Ordered.

Dated: Brooklyn, New York
October 17, 2019

s/ ENV
_____
ERIC N. VITALIANO
United States District Judge